# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

LISA HIGH,       )
           )
  Plaintiff,     )
           )  **Case No. 3:04-0673**
v.          )  **Judge Trauger**
           )
UNITED EQUIPMENT, INC., d/b/a/ )
EQUIPMENT SUPPORT SERVICES, )
           )
  Defendant.    )

## MEMORANDUM

Pending before the court is the Motion for Summary Judgment filed by the defendant, United Equipment, Inc., d/b/a Equipment Support Services (Docket No. 33), to which plaintiff Lisa High has responded (Docket No. 40), and the defendant has replied (Docket No. 46). For the reasons discussed herein, the defendant's motion will be denied in part and granted in part.

## FACTUAL BACKGROUND

United Equipment, Inc. ("UE") was, at all times relevant to this case, a wholly owned subsidiary of Equipment Support Services ("ESS"),[1] a corporation that sells, leases, and repairs

---

[1]ESS divested itself of UE in April 2004. UE is no longer an active corporation. (*See* Docket No. 33, Ex. I, Randy Goss Dep., at 17)

1

construction and agriculture-related equipment.[2,3] UE had two branches in Tennessee, one in Memphis and one in LaVergne.

The plaintiff began working as an account manager at UE's LaVergne branch on January 30, 2003. At that time, ESS, which controlled UE, was headed by Randy Goss, who served as the corporation's president and chief executive officer ("CEO"). (*See* Docket No. 33, Ex. I, Randy Goss Dep., at 17) Tom Darnell served as the general manager for both of UE's Tennessee locations, which were locally led by sales managers Rex Thigpen in LaVergne and Joe LaRue in Memphis. In June 2003, in an effort to boost sales, LaRue assumed managerial

---

[2]Unless otherwise noted, all facts have been drawn from the plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Docket No. 42) and her Memorandum in Opposition to Defendant's Motion for Summary Judgement (Docket No. 41).

[3]The defendant has moved to strike any facts to which the plaintiff referred in her Memorandum in Opposition to Defendant's Motion for Summary Judgment (Docket No. 41) but did not enumerate in her Response to Defendant's Statement of Undisputed Material Facts (Docket No. 42). (*See* Docket No. 49) It argues that the plaintiff's inclusion of these facts violates Local Rule 8(b)(7), which provides that "the non-movant's response may contain a concise statement of any additional facts the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried." M.D. Tenn. R. 8(b)(7).
    The plaintiff responds that the defendant's motion is based on an overly technical reading of the rule and that, to the extent that she did include non-enumerated facts in her Memorandum in Opposition to Defendant's Motion for Summary Judgement, those facts were either non-material or else responsive to the defendant's facts and thereby not qualified as "additional," such as would allow them to be separately enumerated.
    An examination of the facts that the plaintiff cited in her Response to Defendant's Statement of Undisputed Material Facts reveals that many of the facts left unenumerated by the plaintiff are, in fact, immaterial, uncontested, or responsive. The few facts that do not fall into one of these categories include citations to the record. (*See, e.g.*, Docket No. 41 at 5 (citing "Ex. I, Pl. Resp. MSJ, High Aff., Paras. 7-8" and asserting that "High has identified additional accounts from the Customer List for which she was not paid commissions for service work")) Particularly given the non-compulsory wording of Rule 8(b)(7), requiring the plaintiff to separately list any additional facts, which the defendant has now enumerated and responded to (*see* Docket No. 48), would not be in the interests of judicial utility, nor would striking such facts advance the interests of fairness. *See* M.D. Tenn. R. 8(b)(7) ("the non-movant's response *may* contain a concise statement . . .") (emphasis added). Accordingly, the defendant's Motion to Strike will be denied.

Case 3:04-cv-00673   Document 51   Filed 01/09/06   Page 2 of 21 PageID #: 568

duties over both branches. Thigpen remained in LaVergne as an account manager until January 2004, when he resigned after a commission dispute. LaRue later was demoted to an account manager position and ultimately was "relieved of his position" altogether in October 2003. (*See* Docket No. 40, Ex. A, Joe LaRue Aff., at 18, 21-22)

The plaintiff came to UE with extensive sales experience, including work as an account manager for Rollins Truck Leasing, where she was ranked in the top third of Rollins salespeople nationwide, as well as eight years of experience in healthcare sales. As an account manager at UE, she was responsible for fostering transactions with a list of existing customers. She earned her commission based on these customers' purchase or rental of parts and equipment.

All account managers at UE were at-will employees who did not have employment contracts. (*See* Docket No. 33, Ex. A, Excerpts from Pl.'s Dep., at 173) ESS's Account Manager Plan governed the specifics of how much commission an account manager would receive for a particular transaction. (*See* Docket No. 33, Ex. C, ESS Account Manager Plan, at 4) The plaintiff received a copy of this plan, which both she and then-Sales Manager Thigpen signed, in "agree[ment of] its conditions," on April 14, 2003.

During the time of the plaintiff's employ at UE, the LaVergne branch was struggling to become profitable. According to both LaRue and Thigpen, total sales volumes were very low and the office was hampered by a stagnant market, among other detractors. Both former sales managers claim that, as a result of these conditions, few account managers produced stellar sales results.

In July and August 2003, the plaintiff negotiated a $959,904.00 rent-to-own transaction with Team Construction, which was one of her customers. During these negotiations, it came to light that another corporation, NationsRent, was seeking to purchase the same equipment from

3

UE in hopes of then renting it to Team Construction. At the time, NationsRent was in bankruptcy and, according to Darnell, "their financing had been cut off by every manufacturer in the United States." (*See* Docket No. 33, Ex. J, Excerpts from Thomas Darnell Dep., at 119) The NationsRent account was assigned to Jamey Dennis, another account manager in the LaVergne office. Once Dennis and the plaintiff realized the overlap between their clients, they agreed to pursue the Team Construction deal together and to share any commission arising from it.

According to the plaintiff, Team Construction's credit had been approved and she and Dennis were in Team Construction's offices, about to close the deal, when Darnell called with instructions from Goss to abort the transaction. Goss had decided instead to sell the equipment at issue to NationsRent, with whose vice president he had "a personal relationship going back many years." (*See* Docket No. 33, Ex. I, Randy Goss Dep., at 108) The plaintiff never received any compensation from the sale, despite the fact that LaRue urged Goss to pay her half of the commission arising out of it because she "had done all the work" to negotiate it. (*See* Docket No. 41 at 12)

Darnell fired the plaintiff on September 18, 2003, allegedly because she had performed poorly as a saleswoman. Plaintiff previously had received a performance evaluation written by Thigpen and approved by Darnell that contained, among some positive comments, a number of relatively negative ones, all of which Thigpen had penned. Darnell's only comment on the evaluation was a notation that she "ha[d] developed a kinship with fellow employees." Thigpen later claimed that he did not intend for his review of the plaintiff to be a negative one, but rather that he always listed areas of improvement on his evaluations in hopes that he would motivate his employees to better their performance. LaRue and Thigpen, both of whom had daily supervisory duties over the plaintiff, have asserted that she was a valuable employee with a

4

strong work ethic whose sales were comparable to those of other account managers in the LaVergne branch, all of whom were male.[4]

## ANALYSIS

The plaintiff presents two claims. In her first claim, she asserts that she was discriminated against on the basis of her gender when she was terminated from her position as an account manager at UE. In her second claim, she seeks, under a breach-of-contract theory, to recover the sales commissions that she believes are still owed to her by UE.[5]

### 1.    Summary Judgment Standard

The defendant has moved for summary judgment on both the plaintiff's discrimination claim and on her claims of breach of contract. Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing

---

[4]The plaintiff was the only female account manager in the LaVergne office. Of the remaining account managers at ESS, of whom there were approximately 43, only one was female. (*See* Docket No. 1 ¶¶ 15, 21)

[5]The plaintiff, in her Complaint, also sought a judgment for unpaid wages pursuant to the Equal Pay Act. (*See* Docket No. 1 ¶ 5); 29 U.S.C. § 206(d)(1) (2000). Per her own admission, she has effectively withdrawn this claim. (*See* Docket No. 33, Ex. A, Pl.'s Dep., at 90 ("Are you claiming in this lawsuit that you were paid less because you were a woman, that it was discriminatory to pay you what you were paid? No."); Docket No. 42 ¶ 4 ("Plaintiff is not claiming that she was paid at a lesser rate or a lesser salary than male employees. . . Admitted."))

5

party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment

6

inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49). With this standard in mind, the court turns to an analysis of the plaintiff's claims.

**2. A Reasonable Jury Could Find that the Plaintiff was Subjected to Disparate Treatment Discrimination**

The plaintiff's discrimination claim is asserted under both Title VII of the Civil Rights Act of 1964 ("Title VII") and the Tennessee Human Rights Act ("THRA"). Because "the stated purpose and intent of the [THRA] is to provide for execution within Tennessee of the policies embodied in the federal civil rights laws," the analysis of claims under the THRA is the same as under Title VII.." *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996) (citing Tenn. Code. Ann. § 4-21-101(a)(1) (2005)); *see also Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001). Accordingly, the analysis of the plaintiff's Title VII claims applies to her THRA claims, as well.

To make out a claim of disparate treatment on the basis of gender, as the plaintiff seeks to do here, a plaintiff may either present direct evidence of discrimination or adduce circumstantial evidence to create an inference of discrimination under the *McDonnell Douglas Corp. v. Green* burden-shifting approach. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-55 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 463 (6th Cir. 2003). Because the plaintiff here presents no direct evidence in support of her claims, the *McDonnell Douglas* analysis is appropriate.

Under this analysis, a plaintiff first must establish a *prima facie* case of discrimination. *See McDonnell Douglas Corp.*, 411 U.S. at 802; *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002) (citing *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246-47 (6th Cir. 1995)). A

7

plaintiff fulfills this requirement when she demonstrates that (1) she is a member of a protected class; (2) she was subject to an adverse employment decision; (3) she was qualified for the position that is the subject of her complaint; and (4) she was either replaced by a person outside of her protected class or treated less favorably than a similarly situated, non-protected employee. *See Clayton v. Meijer*, 281 F.3d 605, 610 (6th Cir. 2002) (citing *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246–47 (6th Cir. 1995); *Mitchell v. Toledo Hosp.*, 94 F.2d 577, 582-83 (6th Cir. 1992); *see also Burdine*, 450 U.S. at 254 n.6; *McDonnell Douglas*, 411 U.S. at 802.

Once a plaintiff demonstrates her *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action, after which the plaintiff must demonstrate that the proffered reason was a mere pretext for what was actually an improper motive. *See Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003); *Williams v. Nashville Network*, 132 F.3d 1123, 1131 (6th Cir. 1997).

### a. A reasonable jury could find that plaintiff has established a *prima facie* case of discrimination

The defendant disputes only the third, "similarly situated" prong of the plaintiff's *prima facie* case. (S*ee* Docket No. 34 at 9) Accordingly, the court will focus its analysis there.[6] As noted above, a plaintiff meets her burden of establishing this prong when she demonstrates that she was replaced by a person outside of her protected class or that she was treated less favorably than a similarly situated, non-protected employee. *See Clayton*, 281 F.3d at 610. The plaintiff

---

[6]The plaintiff also attempts to raise a discrimination claim based on her complaint that she was denied transfer opportunities. (*See* Docket No. 41 at 9) Because the transfer she allegedly sought was lateral, at best, its denial does not qualify as an adverse action. *See Reese v. Mich. Family Indep. Agency*, 31 Fed. App'x 172, 173 (6th Cir. 2000) (finding that the denial of a request for a lateral transfer is not an adverse employment action for Title VII purposes). The analysis of her discrimination claim, therefore, will proceed using only her termination as an adverse action.

8

has not demonstrated that she was replaced by a person outside of her protected class, i.e. by a man.  She must show, therefore, that she was treated less favorably than a similarly situated, male employee.

A plaintiff "need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly situated; however, the plaintiff and the comparable must be similar in all relevant respects."  *Hoskins v. Oakland County Sheriff's Dep't*, 222 F.3d 719, 732 (6th Cir. 2000) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)) (internal quotations omitted).  In determining which respects are relevant, the court must not rely on any sort of rigid articulation of necessary factors, but instead must make "an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee."  *See Ercegovich*, 154 F.3d at 352.  At various points in her filings, the plaintiff identifies three different individuals as being similarly situated to her.  Specifically, she points to Byran Johns, Scott McKee, and Clark Beard as appropriate comparators.  Although, as explained below, the first two men cannot properly be identified as similarly situated to the plaintiff, a reasonable jury could find that Clark Beard does fall under such a rubric.

Because Johns was an account manager with lower reported sale figures than the plaintiff (*see* Docket No. 40, Ex. K, Account Manager Recap) who was transferred to another position within UE instead of being terminated (*see* Docket No. 41 at 13-14), he initially seems to qualify as similarly situated to the plaintiff.  By the plaintiff's own admission, however, Johns worked out of the Memphis office, rather than the LaVergne one, and "the Memphis market was different."  (*See* Docket No. 41 at 17; *see also* Docket No. 40, Ex. D, Pl.'s Dep., at 42 ("Br[y]an Johns was at the Memphis office."))  Accordingly, because the market in which Johns operated

9

differed from the one in which the plaintiff worked, the two employees cannot be considered to be "similar in all relevant respects." *See Hoskins*, 222 F.3d at 732.

Although she does not maintain in her summary judgment filings that Scott McKee is a fair comparator, the plaintiff does assert such in her earlier statements. (*Compare* Docket No. 41 at 17 ("it is inappropriate to compare Ms. High with . . . McKee") *with* Docket No. 33, Ex. L, Answer to Def.'s Interrog., ¶ 5 (naming McKee as an example of a similarly situated individual)) Regardless, McKee does not qualify as similarly situated to her because not only were his overall sales figures significantly higher than hers (*see* Docket No. 40, Ex. K, Account Manager Recap), but he was also staffed in the Memphis office, as opposed to in LaVergne (*see* Docket No. 33, Ex. A, Pl.'s Dep., at 214 ("Scott McKee is . . . one of the other account managers in Memphis.")). Thus, like Johns, McKee does not qualify as similarly situated to the plaintiff.

A genuine dispute of material fact exists, however, as to whether Clark Beard was similarly situated to the plaintiff. Like the plaintiff, Beard worked out of the LaVergne office. (*See* Docket No. 33, Ex. A, Pl.'s Dep., at 42 ("Clark Beard was at the office in LaVergne.")) Additionally, Beard's sales numbers were lower than the plaintiff's. (*See* Docket No. 40, Ex. K, Account Manager Recap) The plaintiff claims that Beard was not terminated, despite his low sales performance, and that this fact thereby indicates that he was treated more favorably than she was. (*See* Docket No. 41 at 8)

Whether Beard was, in fact, fired is a question of some controversy. To bolster her assertion that he was not terminated, the plaintiff points to statements made by General Manager Darnell. In his deposition, Darnell asserted that Beard was not fired, but rather, left of his own accord to "seek other employment." (*See* Docket No. 40, Ex. F, Darnell Dep., at 41) Darnell explained further that, although he and other supervisors had discussed firing Beard, they never

10

told him as such, although they did mention to him that they were unsatisfied with his job performance. (*Id.* at 42) The plaintiff also notes that Beard's name appears on a December 2003 list of UE employees and that Beard was still an account manager as of January 2004. (*See* Docket No. 41 at 8-9) She claims that these facts also indicate that Beard was not fired. The defendant, on the other hand, asserts that Beard was fired for "lack of performance" on January 15, 2004, thus nullifying the plaintiff's latter assertions. (*See* Docket No. 47, Exs. B-C (indicating that Beard was involuntarily discharged for lack of performance))

While the separation notices provided by the defendant do explain how Beard could have been correctly named as a UE employee in December 2003 and January 2004 and, yet, still terminated shortly thereafter, they do not adequately account for Darnell's September 2005 statements that Beard had left UE of his own accord. Inexplicably, the defendant never accounts for the disconnect between Darnell's testimony and the paperwork. A reasonable jury could thus conclude that, unlike the plaintiff, Beard was not terminated, despite the fact that he performed more poorly than she did. Accordingly, Beard qualifies as an adequate comparator, and the plaintiff has met her burden of demonstrating that a genuine issue of material fact exists as to whether a similarly situated, non-protected employee was treated better than she was.

Because the defendant does not dispute any of the other aspects of the plaintiff's *prima facie* case, the plaintiff's fulfillment of the similarly situated prong establishes her *prima facie* case of gender discrimination. The court now must consider whether the defendant has advanced a legitimate, nondiscriminatory reason for terminating the plaintiff.

### b. The defendant has advanced a legitimate, nondiscriminatory reason for terminating the plaintiff

Once the plaintiff has established a *prima facie* case of retaliation, the burden of

11

producing some legitimate, nondiscriminatory reason for the action falls on the defendant. *Burdine*, 450 U.S. at 254; *Williams*, 132 F.3d at 1131. This is a burden of production; while the defendant "need not persuade the court that it was actually motivated by the proffered reasons," it must raise "a genuine issue of fact as to whether it discriminated against the plaintiff." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 666 (6th Cir. 2000) (citing *Burdine*, 450 U.S. at 254). In making this showing, the defendant must "clearly set forth . . . the reasons for the plaintiff's rejection," and such reasons "must be legally sufficient to justify a judgment for the defendant." *Cline*, 206 F.3d at 666.

The defendant claims that the plaintiff was fired for poor performance, *i.e.*, because her total sales as of September 2003 (seven months after she was hired) were not satisfactorily high. (*See* Docket No. 34 at 12) With the proffer of this explanation, the defendant has met its burden at this stage of the *McDonnell Douglas* analysis.[7] *See Clark v. Alcan Aluminum Corp.*, 41 Fed. App'x 767, 775 (6th Cir. 2002 ) (explicitly citing poor performance as a legitimate reason for an adverse action). Accordingly, the onus now shifts to the plaintiff to demonstrate that the defendant's asserted reason for her termination was mere pretext for discrimination. *See Abbott*, 348 F.3d at 542.

### c. A reasonable jury could find that plaintiff has demonstrated that the defendant's reason for her termination is a mere pretext for discrimination

To demonstrate that her employer's explanation is pretextual, a plaintiff must show, by a

---

[7]The defendant correctly notes that, contrary to the plaintiff's assertion (*see* Docket No. 41 at 14), it is not required here to explain why it allegedly treated the plaintiff differently from other employees, but instead is obligated to articulate a legitimate, nondiscriminatory reason for taking the adverse employment action of which the plaintiff complains, *i.e.*, her termination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (requiring an employer to articulate a legitimate, nondiscriminatory reason for its adverse action).

12

preponderance of the evidence, one of the following: (1) that the proffered reasons had no basis in fact; (2) that the reasons did not actually motivate the employer's actions; or (3) that the reasons were insufficient to motivate the employer's actions. *Manzer v. Diamond Shamrock Chemicals*, 29 F.3d 1078, 1084 (6th Cir. 1994). "A blanket denial that the employer's articulated reasons for [taking an adverse action against an employee] . . . were incorrect . . . is not enough; a plaintiff must take the extra step of presenting evidence to show that the reasons given are an attempt to cover up the employer's alleged real discriminatory motive." *Irvin v. Airco Carbide*, 837 F.2d 724, 726 (6th Cir. 1987). If the plaintiff demonstrates that the defendant's proffered, nondiscriminatory reason is a pretext, then the fact finder may infer unlawful discrimination. *See Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 345-46 (6th Cir. 1997).

Here, the plaintiff appears to attempt the first showing suggested in *Manzer*. She argues, among other things, that the defendant's proffered reason for her termination had no basis in fact, *i.e.*, that it was "factually false." (*See* Docket No. 41 at 15-16 ("there is sufficient proof that basing the termination on these grounds has no basis in fact")); *Reeves v. Sanderson Plumbing Prods.*, Inc., 530 U.S. 133, 147 (2000) ("it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation") (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993)) (emphasis omitted); *Manzer*, 29 F.3d at 1084 (6th Cir. 1994). Specifically, the plaintiff claims that the defendant's proffered reason for firing her-- because her sales numbers were too low--was factually incorrect. She refutes each of the defendant's examples of her incompetence.

For instance, for the purposes of justifying the plaintiff's termination, the defendant explains that it was dissatisfied with the amount of equipment that she sold during her tenure

with UE. It notes that, sixth months into her employ, the plaintiff's sales numbers had not risen to the $500,000 mark. According to President and CEO Goss, as well as Darnell, this productivity level would have indicated competent salesmanship.[8] (*See* Docket No. 33, Ex. I, Randy Goss Dep., at 37; Ex. J, Thomas Darnell Dep., at 127)

The plaintiff has demonstrated, however, that her sales numbers would have been significantly higher but for the fact that her superiors at UE decided to nullify the large sale that she had negotiated with Team Construction shortly before she was fired. (*See* Docket No. 42 ¶ 26) Indeed, according to the plaintiff, she was on the verge of completing the $959,904.00 deal with Team Construction, and had already obtained financing for it, when Darnell halted it on behalf of Goss. (*See* Docket No. 42 ¶ 26; Docket No. 40, Ex. E, Exs. to Lisa High Dep., at 7 (August 2003 Team Construction Proposal)) Darnell admits that, had Goss not cancelled the deal that the plaintiff had negotiated with Team, she would have been credited with sales that far exceeded the $500,000 threshold. (*See* Docket No. 33, Ex. J, Thomas Darnell Dep., at 128) Additionally, he acknowledges that he would not have terminated the plaintiff when he did, had the deal come to fruition. (*See* Docket No. 48, Attach. Excerpts from Thomas Darnell Dep. at 128)

It is not the court's place to second-guess the defendant's business decision to abort the deal with Team Construction. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000)

---

[8]The $500,000 threshold is not necessarily a reliable marker for employee performance, as it appears that few, if any, account managers even knew of such a sales goal. (*See* Docket No. 41 at 7 ("There were no set sales quotas or sales goals for [a]ccount [m]anagers.")) Additionally, very few account managers at UE appear to have reached that threshold. (*See* Docket No. 40, Ex. K, Account Manager Recap)

14

(finding that "it is inappropriate for the judiciary to substitute its judgment for that of management"). However, the fact that the plaintiff had negotiated a sale that would have placed her at least among, if not above, other account managers in the LaVergne office undermines the defendant's assertions that her sales numbers were too low to warrant allowing her to remain in her position. (*See* Docket No. 40, Ex. K, Account Manager Recap)

The defendant, in seeking to bolster its reason for firing the plaintiff, asserts that Darnell was displeased with the plaintiff's overall performance and with her ability to make sales. (*See* Docket No. 34 at 6) It also notes that the plaintiff's performance evaluation for February through May 2003 contains a number of rather negative remarks, including "does not pursue opportunities"[9] and "has not built a sales deal." (*See* Docket No. 33, Ex. D, ESS Performance Review for Lisa High, at 2, 6)

The plaintiff refutes these allegations with testimony from her two former first-line managers, LaRue and Thigpen. LaRue asserts that the plaintiff was a "very hard worker [who] performed her duties as an [a]ccount [m]anager as well as any other account manager in the LaVergne office" and that she submitted as many sales quotes and made as many sales calls as did other account managers. (*See* Docket No. 40, Ex. A, Joe LaRue Aff., ¶¶ 10-11) Thigpen echoes LaRue's statements in support of the plaintiff. (*See* Docket No. 40, Ex. B, Rex Thigpen Aff., ¶ 6 ("Based on my observations and experience, Ms. High was a very hard worker and performed her duties as an [a]ccount [m]anager as well as other [a]ccount [m]anagers in the LaVergne office.")) He also explains that the plaintiff's May 2003 evaluation that he wrote was

---

[9]A notation that "Lisa is still in training and developing job skills and product knowledge" accompanies this comment on the plaintiff's evaluation. (*See* Docket No. 33, Ex. D, ESS Performance Review for Lisa High, at 3)

15

not intended to be negative, but rather was in line with other evaluations he completed, which always included indications of areas for improvement.  (*See* Docket No. 40, Ex. B, Russ Thigpen Aff., ¶ 11)

Because both LaRue and Thigpen worked with the plaintiff on a daily basis and were, therefore, very familiar with her work product, their comments could lead a reasonable jury to find that the defendant's proffered reason for firing her had no basis in fact.  *Cf. Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 729 (6th Cir. 1999) (finding the testimony of colleagues who did not work with the plaintiff on a daily basis to be immaterial to the plaintiff's efforts to prove that she had met her employer's legitimate expectations).[10]  Additionally, the fact that the plaintiff had negotiated a deal with Team that would have placed her high on the list of account managers in the LaVergne office, had her superiors not canceled it, might provide further grounds for a jury to disbelieve the defendant.[11]

_____

[10] The defendant asserts that statements made by employees who were uninvolved in the decision to take an adverse action against a plaintiff are irrelevant for the purposes of demonstrating pretext, as well as that the plaintiff has done little more than cast doubt on the defendant's proffered explanation for its actions, an effort that is not enough to make out a case of discrimination.  (*See* Docket No. 49 at 8 (citing *Gover v. Speedway Super America*, 284 F. Supp. 2d 858, 864 (S.D. Ohio 2003)); Docket No. 46 at 4 (citing *Browing v. Rohn & Haas Tenn., Inc.*, 16 F. Supp. 2d 896, 907 (E.D. Tenn. 1998)) At this stage of the proceedings, however, these assertions, which provide citations that are largely distinguishable from the case at hand, fail to convince the court that no reasonable jury in this case could find evidence of pretext.

[11] The plaintiff alleges that a number of remarks made by Darnell provide additional evidence of pretext.  Specifically, she asserts that Darnell once asked her "whether her tan lines were real," and once stated to LaRue that the plaintiff "did not fit his criteria of the 'type' of woman suited to work in the equipment and sales/rental/service business" and "needed to wear blue jeans, not dresses and high heels."  (*See* Docket No. 41 at 18)
In the Sixth Circuit, "workplace remarks furnished as evidence of discrimination [must be] clear, pertinent, and directly related to decision-making personnel or processes in order to prove discriminatory intent."  *Wilson v. Wells Aluminum Corp.*, 1997 WL 52921, at *5 (6th Cir. Feb. 7, 1997) (unpublished).  Additionally, to prove discrimination, anecdotal evidence must go

16

Accordingly, the court finds that the plaintiff has met her burden of demonstrating that a reasonable jury could find that the defendant's explanation for its adverse action against her was mere pretext for discrimination. Summary judgment on the plaintiff's Title VII and THRA discrimination claims is accordingly improper at this juncture, and the defendant's motion is denied.

**3.     Some Genuine Issues of Material Fact Exist as to the Plaintiff's Breach of Contract Claims**

The plaintiff's breach-of-contract claim has two components: (1) she maintains that she is owed a $6,562.50 commission for the sale that she negotiated with Team Construction (*see* Docket No. 41 at 11), which ultimately was eclipsed by the NationsRent transaction; and (2) she asserts a claim for various other commissions that she believes that she earned prior to her termination (*see id.* at 9).

> **a.     No reasonable jury could find that the plaintiff is entitled to a commission from the Team Construction/NationsRent transaction**

The plaintiff claims that she is entitled to a commission stemming from UE's sale of a large amount of construction-related equipment to NationsRent. (*See* Docket No. 41 at 20) She grounds her claim in a transaction that she negotiated with Team Construction, which involved the same equipment as that ultimately sold to NationsRent and which was terminated in favor of

beyond "merely vague, ambiguous, or isolated remarks." *Cooley v. Carmike Cinemas, Inc.,* 25 F.3d 1325, 1330 (6th Cir. 1994); *see also Dobbs-Weinstein v. Vanderbilt Univ.*, 1 F. Supp. 2d 783, 798-99 (M.D. Tenn. 1998).

The court finds that Darnell's scattered and often ambiguous remarks do not rise to the elevated level necessary to demonstrate intentional discrimination. Accordingly, they do not serve as additional evidence of pretext for the purposes of this motion.

17

the NationsRent deal at the behest of President and CEO Goss. According to the plaintiff, because Team Construction, as her client, was to be the ultimate recipient of the equipment purchased by NationsRent, she was owed half of the commissions from the deal. (*See id.*) She alleges that a number of UE employees, including Sales Manager Joe LaRue and Account Manager Jamey Dennis, who was in charge of the NationsRent account, signed onto this arrangement. (*See* Docket No. 42 at ¶ 16 (Plaintiff's Response) ("given that the end recipient of the equipment was Team Construction, LaRue thought it was appropriate that Ms. High split the commission, which was agreed to by Jamey Dennis"))

The plaintiff herself admits, however, that neither LaRue nor General Manager Tom Darnell ever guaranteed her outright that she would receive a portion of the commission from the NationsRent deal, but rather said only that they "would do the very best that they could" to help her obtain the money. (*See* Docket No. 33, Ex. A, Excerpts from Pl.'s Dep., at 151-52) Additionally, the plaintiff acknowledges that account managers at UE generally were not entitled to receive a commission from a sale until a deal was closed and the purchaser had paid for the product. (*See id.* at 84 ("[I]t's correct that you were only supposed to receive commissions once a deal was closed and paid, right? Yes."))

Even with all reasonable inferences drawn in her favor, the plaintiff has not shown that the defendant breached any agreement to pay her a commission for her work on the Team Construction/NationsRent deal. At best, even if she could demonstrate that her manager's statements were sufficient to bind the corporation as a whole–a showing that she has not attempted to make–she has asserted only that her superiors promised to *try* to procure her commission. The plaintiff herself asserts that at least LaRue did, in fact, make such an effort.

18

(*See* Docket No. 41 at 3)  Thus, because the plaintiff has not shown that her superiors promised her that she would actually receive a commission from this particular deal, no reasonable jury could find that the fact that she did not receive one constitutes a breach of contract. Accordingly, summary judgment on this claim is granted.

### b. Genuine issues of material fact remain as to whether the plaintiff is owed commissions from transactions she completed prior to her termination

In addition to her claims that she is owed a commission as a result of the Team Construction/NationsRent transaction, the plaintiff complains that she has not been paid for deals that she negotiated on behalf of UE prior to her termination.  Specifically, she alleges that, in addition to "any commissions that [UE] admits [she] was not paid," she is owed $2,098.79 in unpaid commissions from service and repair work performed on behalf of customers whose accounts she managed.  (*See* Docket No. 40, Ex. I, Pl.'s Aff., ¶ 8)

According to ESS General Sales Manager Kyle Foley, who reviewed "the available invoices and other documents relating to various accounts which, according to ESS's records, were assigned to Lisa High as of the date her employment with ESS ended," the plaintiff is owed "approximately $762.00" in unpaid commissions.  (*See* Docket No. 37 ¶¶ 4-6)  However, the defendant claims, per Foley's calculations, that the plaintiff owes it $2,850.01 in commission draws[12] and that she is thus liable to it for a total of $2,087.42.  (*See id.* ¶ 7)

_____

[12]Under the terms of the ESS Account Manager Plan, account managers received an advance of $1000.00 in commission draws every pay period in order to cover benefits and child support expenses.  (*See* Docket No. 33, Ex. C, ESS Account Manager Plan, at 4)  These advances were automatically deducted from the account manager's next commission pay out. (*Id.*)  The defendant claims that the plaintiff accumulated $2,850.01 in debt when she did not earn enough in commission to cover the money given to her in the form of draws.  (*See* Docket No. 46 at 11)

19

The plaintiff refutes the defendant's allegation that she is in debt to the corporation by asserting that she "was never given credit for the sale, rentals, and service [for which she claims she is owed commission], so Defendant's accounting records are an improper measure on what is owed to [her]." (*See* Docket No. 48 ¶ 52) She claims that the defendant's failure to pay her these commissions constitutes not a breach of any employment contract, which she admits she never had (*see* Docket No. 33, Ex. A, Excerpts from Pl.'s Dep., at 173), but rather a breach of the parties' agreement as to how she would be compensated, as embodied in the ESS Account Manager Plan (*see* Docket No. 41 at 19; Docket No. 33, Ex. C, ESS Account Manager Plan, at 4).

Neither party refutes the existence of this plan nor challenges its binding nature. (*See* Docket No. 41 at 19 (assertion by the plaintiff that "Defendant was obligated to pay [the plaintiff] under the terms of the [ESS] Account Manager Plan); Docket No. 48 ¶¶ 16-17 (recognition by the defendant that the plan exists and acknowledgment that it delineates the rates by which employees earn commission)) Instead, the parties dispute whether the plaintiff was given credit for particular transactions and if she was compensated accordingly. The defendant has failed to provide sufficient information demonstrating that there exists no genuine dispute of material fact as to these issues. Accordingly, summary judgment on this claim is denied.

## CONCLUSION

Genuine issues of material fact exist as to whether the plaintiff was subjected to disparate treatment discrimination and whether she is owed a commission for various transactions that she negotiated prior to her termination from EU. Accordingly, the defendant's motion for summary

20

judgment on these claims will be denied.  No reasonable jury could find, however, that the

defendant's failure to pay her a commission arising from the Team Construction/NationsRent

deal constituted a breach of contract.  Summary judgment on this claim is therefore granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge